[No. 20598.   Department Two. — February 14, 1890.]

THE PEOPLE, RESPONDENT, *v.* HENRY MULLINGS, APPELLANT.

CRIMINAL LAW — HOMICIDE — EVIDENCE — CROSS-EXAMINATION OF DEFEND-
ANT. — When a defendant accused of murder becomes a witness in his own behalf, and denies the fact that he killed the deceased, a wide latitude of cross-examination is permissible, owing to the general nature of the defendant's statement.

ID. — HUSBAND AND WIFE — PRIVILEGED COMMUNICATIONS. — The defendant upon a trial of a homicide who, as a witness in his own behalf, denies the killing, cannot be cross-examined as to conversations occurring between him and one who was his wife at the time of the conversations, though she was afterward divorced from him.   The code sweeps away all distinction between confidential and other communications between husband and wife, and extends the privilege to any communication made by one to the other during marriage; and no disclosure can be forced from either spouse without the consent of the one against whom the disclosure is sought to be used.   The privilege applies to the communication, however its disclosure may be sought.

ID. — OBJECTIONS TO EVIDENCE — REPETITION OF OBJECTION — PRIVILEGED COMMUNICATIONS — INCOMPETENCY. — When an attorney has clearly and pointedly objected several times to a certain line or class of testimony, and the objection is overruled, he is not required to repeat the objection to every question of the kind objected to.   When objections have been specifically made that certain questions asked called for privileged com-

munications, the objection to similar questions that they are incompetent is, under the circumstances, sufficiently broad to raise the objection that the communications were prohibited by law as being privileged.

ID. — PREJUDICIAL ERROR — INCOMPETENT QUESTIONS AS TO PRIVILEGED COMMUNICATIONS — HARMLESS ANSWERS. — The fact that persistent questions asked of a defendant accused of homicide as to privileged communications between defendant and his wife were answered by the defendant mostly in the negative does not show that defendant was not injured by the error. If it appears that the questions, and not the answers, were what the prosecution thought important, as persistently assuming before the jury the existence of damaging facts, the fact that such questions are erroneous and incompetent is ground for reversal of a judgment of conviction.

APPEAL from a judgment of the Superior Court of Butte County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*W. J. Herrin*, and *M. C. Barney*, for Appellant.

*Attorney-General Johnson*, for Respondent.

McFARLAND, J. — Defendant was charged with the murder of one John S. Moore. He was convicted, and sentenced to the state prison. He appeals from the judgment, and from an order denying him a new trial.

Defendant went upon the stand as a witness in his own behalf. After a denial that he had made one or two statements testified to by one or two of the witnesses for the prosecution, his testimony consisted simply of the following question and answer: "Q. Did you, or did you not, kill John Moore? A. No." Upon cross-examination the prosecution asked him a great variety of questions, against the objections of his attorney that they were not proper cross-examination of a defendant under section 1323 of the Penal Code; that is, that they were not as to "matters about which he was examined in chief." The cross-examination in this respect certainly went, at least, to the very verge of error; a place where prosecuting officers seem frequently to want to go on all doubtful questions. But, considering the general nature of defend-

ant's statement, this court (at least a majority of it) is not prepared to say that error was committed on the sole ground that the questions asked were not proper cross-examination. In the course of the cross-examination, however, the prosecution asked the defendant a long list of questions about conversations between him and his wife, to which his counsel objected, on the additional ground that they were privileged communications, about which he could not be examined. The objection was overruled, and defendant excepted. This was error of a most material character. (At the time of the conversations asked about the person with whom they were had was defendant's wife, although afterward she was divorced from him.)

The provisions of our codes on the subject of privileged communications between husband and wife are little more than a declaration of the common-law rule upon the subject, except in this respect: the privilege at common law did not extend to communications which were not in their nature confidential; and although such communications were generally held *to be* confidential, yet some very difficult questions did occasionally arise as to the character of the communications; but our code sweeps away that embarrassing distinction by extending the privilege to "*any* communication made by one to the other during the marriage." (Code Civ. Proc., sec. 1881.)

The general rule is stated in section 398 of Wharton's Criminal Evidence, as follows: "Aside from the question of interest, confidential communications between husband and wife are so far privileged that the law refuses to permit *either* to be interrogated as to what occurred in the confidential intercourse during the marital relations." The main provision of our codes upon the subject is as follows: "There are particular relations in which it is the policy of the law to encourage confidence and to *preserve it inviolate;* therefore, a person cannot be examined as a witness in the following cases: 1. A husband can-

not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either, during the marriage, *or afterwards,* be, without the consent of the other, examined *as to any communication made by one to the other* during the marriage." The rule is founded on public policy, and its purpose, as stated in the clause of the code just quoted, is to "encourage confidence, and preserve it inviolate"; and no disclosure can be forced from either spouse without the consent of the one against whom it is sought to be used.

In *Murphy* v. *Commonwealth,* 22 Gratt. 960, the rule was applied to a mere witness for the prosecution. In that case, Alexander Murphy was on trial for an alleged assault, with intent to kill, on one John Murphy. John Murphy was a witness for the prosecution, and on cross-examination he was asked by counsel for defendant if he had not stated to his wife that defendant acted only in his own defense. The prosecution objected to the question as privileged, and the objection was sustained, and the supreme court of appeals of Virginia held the ruling correct, because the question "required him to state a communication supposed to have been made by him to his wife, which, if made, was what the law considers a confidential communication, and which he was not bound to disclose." And of course the rule applies much more strongly to a defendant himself on trial upon a serious charge.

It has been repeatedly held that a party offering himself as a witness in his own behalf cannot be cross-examined as to any communication made to his attorney. In *Duttenhofer* v. *State,* 34 Ohio St. 91, 32 Am. Rep. 362, the defendant was indicted for and convicted of forgery. He was a witness for himself; and, on cross-examination, the state succeeded in examining him, over his objection of privilege, about certain communications made by him to his attorney concerning the matter in contro-

versy.    But the supreme court of Ohio reversed the judgment for this error, and in its opinion said, among other things, as follows: "The privilege applies to the *communication;* and it is immaterial whether the client is or is not a party to the action in which the question arises, or whether the disclosure is sought from the client or his legal adviser."    And the court further says: "Nor do we see the propriety of not allowing the attorney to make the disclosures without the consent of his client, and yet compelling the client himself to make them."

In *Bigler* v. *Reyker*, 43 Ind. 112, it was held (we quote for brevity from the *syllabus*) that "communications made in consultation by a client to his attorney are privileged, and protected from inquiry, *when the client is a witness,* as well as when the attorney is a witness."

In *Hemenway* v. *Smith*, 28 Vt. 701, one Orcult, who was a defendant, was a witness on his own behalf, and was cross-examined, against his objection, about consultations with his attorney.    For this error the judgment was reversed, the supreme court of Vermont saying that "the rule should be the same as it would have been if the counsel had been called to prove the consultation."

In *Bobo* v. *Bryson*, 21 Ark. 38, 76 Am. Dec. 406, it is held that a witness is protected from testifying as to any communication he may have made to his attorney in confidence.

In *State* v. *White*, 19 Kan. 445, 27 Am. Rep. 137, the defendant, who was being tried for bigamy, was a witness for himself; and he was cross-examined by the prosecution, against his objection, about consultations with his attorney.    For this error the judgment was reversed; and the court, after reciting that the statute prevents an attorney from testifying about communications made to him by his client, proceeds as follows: "This statute would be of no utility or benefit if the client could be compelled, against his consent, to make such disclosures.    It would be absurd to protect, by

legislative enactment, professional communications, and
to leave them unprotected at the examination of the
client.   In such an event, in all civil actions, the confi-
dential statements of client and counsel would be ex-
posed, and likewise the same would occur in all criminal
actions where the defendant should testify.   The au-
thorities are otherwise."

The reasoning and philosophy of these cases (and
there are many others to the same effect) apply with
increased force to the relation of husband and wife,—a
relation more confidential than that of attorney and
client,—indeed, the most confidential relation known to
human beings.   And we have cited the above cases be-
cause they are closely analogous in principle to the one
at bar, and because we have been unable to find any
reported case where *it has been attempted* to compel a de-
fendant in a criminal case to testify to communications
between his wife and himself.   Slightly changing the
language above quoted from *State* v. *White,* but applying
its principle to this case, we can say that "this statute
would be of no utility or benefit if the *husband* could be
compelled, against his consent, to make such disclosures.
It would be absurd to protect communications between
husband and wife, and to leave them unprotected on the
examination of the husband."   All along the line of the
cases about communications between client and attorney,
it was steadily argued on the one side that the statute
only prevented the attorney from testifying, and that
when the client was on the witness stand he could be
forced to disclose; and the constant answer of the other
side—sustained by the courts — was, "the privilege ap-
plies to the *communication,*" and it cannot be forced from
either party to the confidential relation.   It is clear to
us, therefore, that a defendant in a criminal case who
has offered himself as a witness in his own behalf, and
who has not testified in chief to any communications
between his wife and himself, cannot, without his con-

sent, be examined by the state as to any such communications.

The attorney-general makes the point that the defendant's attorney did not sufficiently object, on the ground of privilege, to the questions asked defendant about communications with his wife; but the point is not tenable. We do not understand that when an attorney has clearly and pointedly objected several times to a certain line or class of testimony he is called upon to repeat his objection to every question. Such repetition would be unbecoming, and needlessly annoying to the court. The first question in the case at bar to which the question applied was this: "What did you say to your wife when you went home that night?" The objection of defendant's counsel was this: "We object to any conversation between him and his wife, as not in cross-examination, and as improper, being a privileged communication." The court overruled the objection, and defendant excepted. Further on, to the question: "Did you not tell your wife that you had killed a man?" the objection was: "We object, on the ground that, even if so, it was a privileged communication." Objection overruled, and defendant excepted. Other objections were made to similar questions which did not expressly state the ground of "privilege," but which did state, among other things, that the question was "not in cross-examination, and incompetent." The word "incompetent," under the circumstances, was sufficiently broad to include the ground of objection under review. Such questions were "incompetent,"—that is, apart from the consideration of relevancy and materiality, they were incompetent, because prohibited by law. Again, toward the close of the cross-examination, when a question was asked about something which the wife was assumed to have said to the defendant, his attorney said: "All this testimony, pretended conversations between this man and his wife, I move to have stricken

out, for the reason that they are not such communica-
tions as can be repeated in any form, because the wife
would not be allowed to come in and testify to them,
and because irrelevant and incompetent for any purpose
whatever.    They are not such conversations as can be
rebutted in any way, but are, if anything, privileged
communications, not allowed to be brought out in court.
I shall ask for a ruling on the motion as soon as the
testimony of the witness is finished."    And at the close
of the examination of defendant, his attorney said as
follows: "Now, we move to strike out all the evidence
with reference to conversations had between this defend-
ant and his wife concerning the killing of John Moore
as not such evidence as can be brought out by the prose-
cution, because privileged."    The motion was overruled,
the court announcing the broad proposition that
"any declaration that he might have made to his wife
he might be interrogated about on cross-examination."
The defendant excepted.    It appears, therefore, that
defendant's objection to the evidence was clear, fair, and
full, that it was thoroughly understood by the court,
and that it was pointedly overruled.

Counsel for respondent contends that the questions
asking defendant about conversations with his wife did
not injure him, because his answers to them were mostly
in the negative.    But what answers were expected? After
defendant testified that he did not kill John Moore, can
any sane man think that the district attorney supposed
for a moment that defendant would answer affirmatively
a long list of questions framed upon the presumption
that he *did* kill him?    Why, then, did he ask them?
And if the questions and answers did not help to
strengthen the case against defendant, why did not the
prosecution consent to have them stricken out?    It is
quite evident that the *questions,* and not the answers,
were what the prosecution thought important.    The pur-
pose of the questions clearly was to keep persistently

before the jury the assumption of damaging facts which could not be proven, and thus impress upon their minds the probability of the existence of the assumed facts upon which the questions were based. To say that such a course would not be prejudicial to defendant is to ignore human experience and the dictates of common sense. The questions themselves were *incompetent;* and after one or two of them had been asked showing the purpose of the prosecution, counsel should not have been allowed to ask others of like character. A similar point to the one under discussion — that is, that the defendant was not injured by the questions on account of the character of the answers — was made in *Gale* v. *People,* 26 Mich. 161; but in that case Judge Cooley, delivering the opinion of the court, says: " A review of the evidence in this case suggests very forcibly that, however full may be the explanation, a list of questions which assume the existence of damaging facts may be put in such a manner, and with such persistency and show of proof, as to impress a jury that there must be something wrong, even though the prisoner fully denies it, and there is no other evidence. Holding that these *questions* were erroneous, and that they might, and probably did, prejudice the prisoner, the conviction must be set aside, and a new trial ordered." Of course, occasionally one or two questions may be erroneously allowed, and the answers may be such that under the circumstances of the case it can be readily seen that no injury was done. For instance, counsel for respondents cites *People* v. *Brown,* 76 Cal. 574. In that case the court was dealing with one single question of doubtful propriety, and held that at all events the defendant could not have been injured by it, because, as the court said: " He would not have been in any more favorable position if the question had neither been asked nor answered." The distinction between that case and the one at bar is too apparent to need pointing out.

We see no other matters in the record necessary to be noticed in detail. The examination of defendant's divorced wife was properly stopped as soon as she was asked about communications between defendant and herself during the marriage. The instruction as to preponderance of evidence is mostly of a negative character, and can hardly be said to be erroneous; but it would be safer for prosecuting attorneys and courts to limit themselves on that subject to the language of the code. Great exuberance in the way of instructions is a prolific source of difficulty. Of course, when a defendant asks for doubtful instructions the court is compelled to pass on them; but district attorneys and courts should not themselves voluntarily load up records with a mass of instructions which are both doubtful and unnecessary.

Judgment and order reversed, and cause remanded for a new trial.

THORNTON, J., and SHARPSTEIN, J., concurred.